**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

KRISHNAN RAMANATHAN
TIGRAN POGOSYAN
ALEXEY KHOMYAKOV
SVITLANA SHCHERBAKOVA
DMITRY KORYUKIN
RAMAZANKADI YUSUPOV

      Plaintiffs

v.

FINANCIAL ALLIANCE LTD
STREAM NETWORK ADVISORY LTD
GL ASSET MANAGEMENT AG
GL FINANCIAL GROUP SA
OOO ANS INVEST, f/k/a ANKOR INVEST
ANKOR CAPITAL LTD
SIA GL FINANCE LATVIA
GERMAN LILLEVALI
IRINA KORYTINA
ANNA LILLEVALI
OLEG LILLEVALI
IGOR LILLEVALI

      Defendants

**COMPLAINT**

**Civil Action No._____**

**JURY DEMAND**

**INTRODUCTION**

1.      This action is against a serial financial entrepreneur and his entourage, who created some 30 shell companies around the world, then lured unsuspecting investors with promises of an allegedly safe investment strategy and on-demand return of investments, then used the funds collected from newer clients to cover withdrawals by older clients, and diverted all remaining funds for the personal benefit and enrichment of those running the scheme.

-1-

2.     During the relevant period of time, the proposed investment strategy, statistical arbitrage, was implemented in the industry using computers executing high-frequency trading algorithms.  Yet, the scheme participants and their shell companies did not have and did not use such equipment, but represented to their investors instead that their hired "traders" were implementing the statistical arbitrage strategy manually while ostensibly yielding performance higher than most investment houses in the world.

## JURISDICTION

3.     This Court's jurisdiction over this matter lies pursuant to 28 U.S.C. 1331 (federal question), and 28 U.S.C. 1367 (supplemental jurisdiction).

## ALLEGATIONS OF FACT

### Plaintiffs

4.     Plaintiff Krishnan Ramanathan, a natural person, is a citizen of the United States residing in Basel, Switzerland.

5.     Plaintiff Tigran Pogosyan, a natural person, is a citizen of the Russian Federation and a citizen of Armenia, residing in Moscow, Russia.

6.     Plaintiff Alexey Khomyakov, a natural person, is a citizen of the Russian Federation residing in Moscow, Russia.

7.     Plaintiff Svitlana Shcherbakova, a person, is a citizen of Ukraine residing in Moscow, Russia.

8.     Plaintiff Dmitry Koryukin, a natural person, is a citizen of the Russian Federation residing in Moscow, Russia.

9.     Plaintiff Ramazankadi Yusupov, a natural person, is a citizen of the Russian Federation residing in Moscow, Russia.

**Defendants**

10.     Defendant Financial Alliance Ltd ("FA") is a corporation organized and existing under the laws of Belize, having its registered address at New Horizon Building, Ground Floor, 3 ½ Miles Phillip S.W. Goldson Highway, Belize City, Belize, C.A., and de facto headquartered in Moscow, Russia, at the offices of Defendant OOO Ankor Invest.

11.     Defendant Stream Network Advisory Ltd ("SNA") (formerly known as Stream Network Ltd) is a corporation organized and existing under the laws of the British Virgin Islands, having its registered address at Geneva Place, Waterfront Drive, PO Box 3469, Road Town, Tortola, British Virgin Islands and de facto headquartered in Moscow, Russia, at the offices of Defendant OOO Ankor Invest.

12.     Defendant GL Asset Management AG ("GLAM") (formerly known as GL Finance Switzerland AG) is a corporation organized and existing under the laws of Switzerland, headquartered in Zurich, Switzerland, and having its registered address at Stockerstrasse 57, 8002 Zurich, Switzerland.

13.     Defendant GL Financial Group SA ("GLFG") is a corporation organized and existing under the laws of Switzerland, headquartered in Geneva, Switzerland, and having its registered address at Place du Cirque 3, 1204 Geneva, Switzerland.

14.     Defendant OOO Ankor Invest ("Ankor" or "Ankor-Russia"), now known as OOO ANS Invest, is a limited liability entity organized and existing under the laws of the Russian

Federation, headquartered at Ul. Nikolskaya 10, Moscow 109012, Russia, and having its registered address at Ul. Aviatsionnaya 77-1-1, Moscow 123182, Russia.

15.     Defendant Ankor Capital LTD ("Ankor-Cyprus") is a corporation organized and existing under the laws of the Republic of Cyprus, headquartered in Limassol, Cyprus, and having its registered address at 28 October Street, 249, Limassol 3035 Cyprus.

16.     Defendant German Lillevali (a.k.a. Lillevälli, Lillevyali, Lillevaeli) ("Lillevali") is a natural person, who is a citizen of Estonia, a citizen of Russia, and a resident of Cyprus, Estonia, and Russia.

17.     Defendant Irina Korytina ("Korytina") is a natural person, who is a citizen of Russia and a resident of Cyprus and Russia.

18.     Defendant Anna Lillevali (a.k.a. Lillevälli, Lillevyali, Lillevaeli) is a natural person, who is a citizen of Estonia and a resident of Latvia.  Anna Lillevali is a niece of German Lillevali.

19.     Defendant Oleg Lillevali (a.k.a. Lillevälli, Lillevyali, Lillevaeli) is a natural person, who is a citizen Estonia residing in Estonia.  Oleg Lillevali is a brother of German Lillevali.

20.     Defendant Igor Lillevali (a.k.a. Lillevälli, Lillevyali, Lillevaeli) is a natural person, who is a citizen and resident of Estonia.  Igor Lillevali is a brother of German Lillevali.

**Background Facts Common to All Plaintiffs**

21.     Upon information and belief, the following facts are alleged.

22.     Defendant German Lillevali (hereinafter Lillevali), who holds both Russian and Estonian citizenship, is a serial entrepreneur, well-known in Moscow financial circles.  He made

-4-

his initial capital in the late 1990s by founding Aktiv Bank in Russia (the bank later went

bankrupt) and by participating in the Dovgan company that was distributing Russian vodka

brands and food products through a multi-level marketing scheme (Dovgan later became

insolvent).

### A.  Initial Financial Companies of Lillevali

23.    In 2008, Lillevali incorporated OOO Stolichnaya Finansovaya Gruppa (translated

as Capital Financial Group Ltd.), a financial company in Moscow, which was granted a broker-

dealer license by the Bank of Russia (Russia's Central Bank) and was trading stocks of Russian

companies listed on the Moscow Stock Exchange.  In 2018, Stolichnaya Finansovaya Gruppa

changed its name to OOO GL Finance.

24.    In 2009, Lillevali incorporated another financial company, OOO Ankor Invest

(Defendant "Ankor" in the instant case), which was also granted a broker-dealer license by the

Bank of Russia.  Ankor changed its name in 2018 to OOO ANS Invest, but is referred to as

"Ankor" or "Ankor-Russia" throughout this Complaint.  Ankor's registered address is Ul.

Aviatsionnaya 77-1-1 Moscow 123182 Russian Federation, and its actual address is/was at Ul.

Nikolskaya 10, Moscow 109012 Russian Federation.

### B.  Lillevali's World Network of Companies

25.    In addition to approximately 15 known Russian financial companies, Defendant

Lillevali (directly and with or through associates) incorporated a number of offshore companies

where either Lillevali or his associates and co-defendants herein were listed as officers or

directors.

26.     Stream Network Ltd was incorporated on July 28, 2010.  On April 23, 2015, this entity changed its name to Stream Network Advisory Ltd, a defendant herein referred to as SNA, with its registered address at Geneva place, Waterfront Drive, P.O. Box 3469, Road Town, Tortola, British Virgin Islands.

27.     On December 10, 2010, Ankor Finance Global Ltd was incorporated, with its registered address at Craigmuir Chambers, Road Town, Tortola, British Virgin Islands.

28.     On March 9, 2011, Cyprus Invest Limited, was incorporated, with its registered address at 2236 Albert Hoy Street, Belize City, Belize.

29.     On August 13, 2012, Lillevali purchased ALLT Family Office S.A.R.L. and renamed it GL Finance Luxembourg Sarl, with its registered address at 6 rue Guillaume Schneider L-2522 Luxembourg.

C.  Establishing the Enterprise

30.     In early 2013 Defendant Lillevali arrived in Cyprus, and on May 24, 2013, applied for registration with the Civil Registry and Migration office of Cyprus as a citizen of the European Union (Estonia).  On May 25, 2013 Defendant Lillevali was issued the Certificate of Registration in Cyprus (a residency certificate).

31.     Upon settling in Cyprus, Defendant GL completed the formation of his "enterprise" in 2013 with a flurry of incorporations in Cyprus, Switzerland, and other jurisdictions. In all the companies Defendant GL and his associates and codefendants were listed as officers or directors.

32.     The initial 8 entities were created as follows.

33.     On April 9, 2013, Ankor Capital Ltd (Defendant in the instant case) was incorporated, with its registered address at 28 Oktovriou, 249, Lophitis Business Center, 3rd floor, Office 301, 3035 Limassol, Cyprus. Subsequently, Ankor Capital Ltd was granted a license by the Cyprus Securities and Exchange Commission as a Management Company under the Open-Ended Undertakings for Collective Investment Law.

34.     On June 28, 2013, another company, LMS Line Ltd, was incorporated, with its registered address at 15 Parthenonos, Office 302, 2020 Strovolos, Nicosia, Cyprus.

35.     On September 11, 2013, GL Finance Cyprus Ltd was incorporated.  This entity was subsequently renamed to GL Finance Capital Investment Ltd, with its registered address at 4A Paphou Street, Nicosia 2103 Cyprus.

36.     On September 25, 2013, Lillevali completed the purchase of Kingsbridge Capital Pte. Ltd., a registered fund management company under the auspices of the Monetary Authority of Singapore and renamed it GL Asset Management Pte. Ltd, with its registered address at 10 Anson Road #11-20, international Plaza, Singapore 079903.

37.     On October 13, 2013, Lillevali completed the purchase of Fidelity Trust (Switzerland) AG, a company in Switzerland that was incorporated in 1980 under the name of Textilagentur Kleinberger AG and initially engaged in import, export, and trade of textiles. Fidelity Trust (Switzerland) was authorized to act as a "trust company, providing advice and asset management to foreign companies and individuals" and "business, finance and investment consulting."  It was renamed GL Finance Switzerland AG after its purchase by Lillevali. The name was subsequently changed on February 2, 2016 to GL Asset Management AG (Defendant

GLAM in the instant case), with its registered address at Stockerstrasse 57, 8003 Zurich, Switzerland.

38.     October 24, 2013, GL Financial Group SA (Defendant GLFG in the instant case), was incorporated, with its registered address initially at  6 rue du Conseil-Général, 1205 Geneva, Switzerland, and then at 3 place du Cirque, 1204 Geneva, Switzerland.  This entity's declared purpose of existence is "holding activities, in particular equity investments, in Switzerland and abroad."

39.     On November 6, 2013, GL Finance London Ltd. was incorporated.  This entity was subsequently renamed on September 27, 2016 to GL Asset Management UK Ltd, with its registered address at 38 Park Street, London, England, W1K 2JF.

40.     On November 13, 2013, Lillevali incorporated SIA IBS GL Finance Latvia, which was subsequently renamed to GL Finance Latvia SIA (hereinafter "GL-Latvia," a Defendant herein) on May 24, 2016, and later to SIA Welst on June 25, 2018, with its registered address at Jura Alunana 2, Riga, LV-1010, Latvia.

D. Expansion of the Network

41.     The creation of some 20 more entities followed, as detailed below.

42.     Incorporation of legal entities in various jurisdictions continued from 2014 through 2017, and most of these and previously incorporated entities were the used to divert client funds.

43.     On March 17, 2014, Kiprinform Tours and Travels Ltd was incorporated, with its registered address at 30 Karpenisiou, 1077 Nicosia, Cyprus.

44.     On April 04, 2014, GL Finance Alliance Ltd was incorporated, with its registered address at PO Box 3469, Geneva Place, Waterfront Drive, Road Town, Tortola, British Virgin Islands (this is the same address as Stream Network Advisory Limited above).

45.     On July 27, 2014, OOO GL Finansovaya Gruppa (translated GL Financial Group Ltd) was incorporated, with its registered address at Ul. Bolshaya Yakimianka, 22, Moscow 119180 Russian Federation.

46.     On September 23, 2014, Carting Invest Ltd was incorporated, with its registered address at 2236 Albert Hoy Street, Belize City, Belize (this is the same address as Cyprus Invest Limited above).

47.     On February 05, 2015, Dellby Holdings Ltd was incorporated, with its registered address at Craigmuir Chambers, Road Town, Tortola, British Virgin Islands (this is the same address as Ankor Finance Global Ltd. above).

48.     On March 03, 2015: Linest Enterprises Ltd was incorporated, with its registered address at  4A Pafou, 2103 Nicosia, Cyprus (this is the same address as GL Finance Capital Investment Ltd above).

49.     On March 27, 2015, Financial Alliance Limited (Defendant FA in the instant case), was incorporated, with its registered address at New Horizon Building, Ground floor, 3 1/2 Miles Philip S.W. Goldson Highway, Belize City, Belize.  This entity obtained a license for international asset protection and management from Belize International Financial Services Commission.

50.     On March 31, 2015, Bay Sky Holdings Ltd was incorporated, with its registered address at Craigmuir Chambers, Road Town, Tortola, British Virgin Islands (this is the same address as Dellby Holdings Ltd and Ankor Finance Global Ltd above).

51.     On June 25, 2015, Gynura Line Exclusive Ltd was incorporated, with its registered address at Ag.Epifaneiou 14, Archangelos, 2055, Nicosia, Cyprus.

52.     On July 14, 2015, Lillevali purchased Iridecea Holdings Ltd and renamed it CL Cyprus Land Limited, with its registered address 54 Demokratias, 2222 Ag. Eleftherios, Latsia, Nicosia, Cyprus.

53.     On December 12, 2015, Terenity Ltd was incorporated, with its registered address at Sofouli 16, Chanteclair, 3th floor, Office 303, 1096, Nicosia, Cyprus.

54.     On January 21, 2016, Pagedel Holding Ltd was incorporated, with its registered address at Tseriou, 107, Building B, Office 001, Lakatamia, 2314, Nicosia, Cyprus.

55.     On March 22, 2016, ABV Consulting SIA was incorporated, with its registered address at Krisjana Valdemara iela 21 - 20 Riga, Latvia.

56.     On August 02, 2016, Globcy Safari Ltd was incorporated, with its registered address at Poseidonos 18, Unit 1, Tourist Pavilion, Kato Pafos, 8042, Paphos, Cyprus.

57.     On June 09, 2016, G.H. Genius Helios Ltd was incorporated, with its registered address at Tseriou, 107, Building B, Flat/Office 001, Lakatamia, 2314, Nicosia, Cyprus.

58.     On February 17, 2016, Exsulo OU was incorporated.  This entity was renamed in 2018 as Mirawarprotections OU, with its registered address at Raba tn 11-14, Palivere alevik, Laane-Nigula vald, Laane maakond, 90802 Estonia.

59.     On August 08, 2016, GL Global Securities SPC Fund was incorporated, with its registered address at PO Box 1350, Clifton House, 75 Fort Street, Grand Cayman KY1-1108, Cayman Islands.

60.     On September 12, 2016, Lillevali purchased Korakor Ltd and renamed  it Cypinform Real Estate Ltd, with its registered address at Georgiou A, 20, Drakos Beach House, Shop C&D, 4047 Limassol, Cyprus.

61.     On February 17, 2017, GC Green Cyprus Limited was incorporated,  with its registered address at Andokidou 12, Germasogeia, 4046, Limassol, Cyprus.

62.     On August 3, 2017, ACY Global Prosperity Umbrella Fund UCITS VCIC PLC was created, with its registered address at 28 Oktovriou, 249, Lophitis Business Center, 3rd floor, Office 301, 3035, Limassol, Cyprus (same address as Defendant Ankor-Cyprus).

**General Operation of the Enterprise**

63.     During the relevant periods of time, Lillevali's enterprise consisting of a world-wide network of companies operated generally as follows.

64.     Companies such as Ankor-Russia and Ankor-Cyprus would recruit investment clients from the general public and have them sign financial services agreements with Ankor-Russia and offshore entities such as FA and SNA.

65.     The Ankor/FA/SNA financial services agreements were then backed by surety agreements whereby the Swiss entities GLAM or GLFG would act as a "guarantor" and surety, assuming liability for non-performance on the part of Ankor and the offshore entities FA and SNA.

66.     The surety agreements were a sham because GLAM and GLFG had capitalization in the amounts of CHF50,000 (later increased to CHF500,000 with investor-clients' funds) and CHF100,000 respectively, well below single investments by a number of clients, including one or more Plaintiffs hereto.

67.     To create an appearance of solid and trustworthy guarantees, Lillevali (directly and/or through his assistants who are the other individual defendants herein) published and caused to be published articles depicting Lillevali as a blood descendant of a purportedly well-known Swiss financial family with the last name of Blumfeldt.

68.     Lillevali also caused to be published articles and other information in the public domain depicting his Swiss entities as being held under a main Swiss holding company that was formed in the early 1900s.

69.     On June 30, 2016, an internet news resource Wealth and Finance International (https://www.wealthandfinance-news.com) published an article titled "Hedge Fund Manager of the Month" dedicated to Defendant GLAM, which claimed: "Originally established in Switzerland as Blumfeldt & Sons, the company's history dates back to 1908. Blumfeldt & Sons built a network of investment experts and served the financial interests of clients in Europe. Later, German Lilleväli and Werner Blumfeldt developed a successful partnership, and in 2013 German combined the assets within GL Asset Management. . . Our experience in asset management dates back to the turn of the 19th century."

70.     A publication with the same claims was then made at Search.ch, a Swiss online directory, and was repeated by many online publications in English, German, and Russian dedicated to Defendant GLAM and Defendant GL, including one that appeared on April 17,

2017 on finews.com, a Swiss financial news site, stating: "[Lillevali's] father is a descendant of the German family of Blumfeldt (the surname Blumfeldt was translated as Lillevali in the 1920s).  In 1996, Lillevali focused on investment and financial business as he began collaborating with his European relative Werner Blumfeldt to develop their family business of providing financial services. In 2013, he headed the business and merged the assets within the GL Financial Group."

71.    In fact, Defendant GLAM began its existence in 2013, when Lillevali purchased Fidelity Trust (Switzerland) AG, a company in Zurich, Switzerland.

72.    Fidelity Trust (Switzerland) AG was incorporated in 1980 under the name of Textilagentur Kleinberger AG and initially engaged in import, export, and trade in textiles.

73.    No company, past or present, is listed in the Zurich corporate register under the name of Blumfeldt & Sons.

74.    In order to induce prospective clients to invest in Defendants' scheme, Defendants touted "secured investments" in the stocks of large US public companies and emphasized purported investments in US stocks over and over again in their promotional materials.

75.    For instance, in Defendant GLFG's November 2017 "Investment Letter" that repeatedly touted the benefits of "equity market neutral and statistical arbitrage," Vladimir Mikhailov, one of the executives of Defendant Ankor-Russia, stated: "Presently, US equities are officially in its second-largest bull market since World War II.  Since March 2009 stocks have climbed more than 250%.  As a consequence, many investors take advice from strategists and analysts regarding how long it will last and which strategies should they ponder to protect their investment portfolios in case of a market downturn."

76.     The above statement was followed by the affirmation of the soundness of the pitched strategy stated as follows: "Clearly, protecting one's portfolio and investments while allocating funds to alternative strategies is paramount, knowing that most investors consider funds and strategies with stable performance and low risk.  These strategies like equity market neutral and statistical arbitrage have low correlation to markets.  In a bullish market, equity market neutral funds post steady performance."  (Emphasis added.)

77.     Likewise, in an introductory article written for Defendant GLFG's December 2017 publication "House View", Defendant German Lillevali stated: "We see obvious advantages and benefits for US corporations if President D. Trump's Tax Reform is approved. Investors, shareholders and investment bankers will have a unique opportunity to book profits via stock buyback programs and distribution of dividends as stocks can risen [sic] significantly. It is also safe to assume going forward, that such repatriation of capital may well have a positive impact on the dynamics of major US stock indexes S&P 500, Dow Jones and Nasdaq." (Emphasis added.)

78.     Each Plaintiff in the instant case made his or her decisions to entrust Defendants with management of their assets based on the above or similar representations and assurances by Defendants concerning "secure investments" in U.S. stocks.

79.     Pursuant to Defendants' scheme as described herein, money was received from clients for the ostensible purpose of investment into publically traded U.S. companies through a brokerage account at a U.S.-based electronic brokerage firm Interactive Brokers LLC ("Interactive Brokers").

80.     Interactive Brokers is a registered U.S.-based broker-dealer and one of the top U.S. trading platforms with exposure to 30 different countries and 100 market centers.

81.     Interactive Brokers typically segregates customer money in special bank or custodial accounts with a portion of customer funds invested in U.S. Treasury securities.

82.     Interactive Brokers typically invests customer money in U.S. Treasury securities, including direct investments in Treasury Bills, Treasury Notes, and reverse repurchase agreements, where the collateral received is in the form of U.S. Treasury securities.  These transactions are conducted with third parties and guaranteed through a central counterparty clearing house located in the United States.  Customer cash is maintained on a net basis in the reserve accounts, which reflect the long balances of some customers and loans to others.

83.     Interactive Brokers holds customer money in special custodial accounts, primarily at large U.S. banks in special reserve accounts.  Such banks, including BB&T, BMO Harris Bank, Sun Trust Bank, and Standard Charter Bank, operate throughout the United States.

84.     At Interactive Brokers, customer-owned, fully-paid securities are protected in accounts at U.S. depositories and custodians that are specifically identified for the exclusive benefit of customers.

85.     In the course of trading, customer cash held by Interactive Brokers in custodial accounts is used to purchase securities, which, after purchase, are held by Interactive Brokers at U.S. depositories and custodian institutions.  When such securities are sold, cash proceeds again go to the Interactive Brokers custodial accounts at large U.S. banks to be used for subsequent trades.  Customer cash and securities remain in Interactive Brokers' custody until such time that

the proceeds are transferred to a customer's own bank account in accordance with customer instructions.

86.     Defendants employed both direct and intermediary broker accounts with Interactive Brokers.

87.     Defendants' scheme boiled down to collecting funds from the public under the (false) appearance of a large Swiss financial conglomerate and then diverting such funds for Defendants' own benefit by means of converting such funds into U.S. dollars using Correspondent Bank accounts in the U.S. and investing such funds through a U.S. broker-dealer into publicly traded U.S. companies in the name of, and for the benefit of, Defendants and at the expense of Plaintiffs.

88.     In its appeal submitted in a bankruptcy proceeding in Russia concerning the now-defunct Zerich Bank, one of the Defendants' enterprise companies, OOO Stolichnaya Finansovaya Gruppa (translated Capital Financial Group Ltd), described its relationship with Interactive Brokers as follows:

89.     " OOO Stolichnaya Finansovaya Gruppa wired its clients' funds to OOO Ankor-Invest's [Defendant Ankor's] account at Zerich Bank, then the clients' funds are wired from Zerich Bank through correspondent accounts at Raiffeisen Zentral Bank AG to Interactive Brokers' account at Citibank (New York).  Withdrawal of client funds from Interactive Brokers is effected through correspondent accounts at Raiffeisen Zentral Bank AG to OOO Ankor-Invest account at Zerich Bank for further credit to OOO Stolichnaya Finansovaya Gruppa clients' accounts."

-16-

90.     Defendant Ankor-Russia also held an additional account at Interactive Brokers through an intermediary, VTB Bank (a Russian bank).

91.     Ankor-Russia also held (and/or holds) a direct account at Interactive Brokers.

92.     Defendant Ankor-Cyprus also held a brokerage account directly with Interactive Brokers.

93.     Defendant FA also held an account with Interactive Brokers, for which FA paid in 2016 a deposit to Interactive Brokers in the amount of $12,000.

94.     From time to time, Ankor-Russia's back office created reports titled "Securities Balance IB."  Such reports listed Ankor-Russia's clients and individual securities ostensibly held on behalf of such clients at Interactive Brokers.

95.     For each such individual security, the reports listed each security's unique International Security Identification Number (ISIN) that identifies financial instruments, including stocks of U.S. companies.  ISIN numbers in the reports created an appearance of specific identifiable US securities attributable to each listed investor (Ankor's client).

96.     For instance, one such report dated March 21, 2018, contained several entries for Plaintiff Yusupov with the names of US companies, such as Automatic Data Processing, BlackRock, Chubb, Equifax, Expedia, General Electric, Morgan Stanley.  Each entry, in addition to company name, contained the date of purchase/sale, place of purchase/sale (NYSE or NASDAQ), number of shares, price per share, and parties to the transaction, with Defendant Ankor-Russia being identified as either purchaser or seller and "Interactive Brokers LLC", correspondingly, as either seller or purchaser.

97.     Another report, also issued in March 2018, and titled "Balance of Securities IB", contained similar entries for Plaintiff Yusupov and, in addition to company name and type and number of securities, listed ISIN number for each company's group of securities and indicated Interactive Brokers as the holder of such securities.

98.     Defendants also employed another U.S.-licensed broker-dealer, QuantRiver Financial LLC, with its principal address and place of business at 6430 Plantation Park Ct, Suite 310, Fort Myers, FL 33966.

99.     As stated on its website, QuantRiver Financial uses QuantRiver™, Intelligent Portfolio Trading Platform developed by QuantRiver Systems, LLC, another Fort Myers, FL company with the same principals as QuantRiver Financial.

100.     QuantRiver Systems promotes its platform worldwide via its English-language website http://www.quantriver.com/, and specifically in Russia through its Russian-language website http://www.quantriver.ru/

101.     In addition to its own proprietary trading platform, QuantRiver Financial also provided Defendants with access to Interactive Brokers' IB Trader WorkStation.

102.     In an email message dated January 31, 2018, Ankor-Cyprus's CEO Oleg Muzychenko wrote to Defendant Korytina "we need to ask QuantRiver about additional instruments (besides stocks)."

103.     From time to time, Ankor-Russia circulated reports titled "Report on Operations," which were initially prepared as Excel spreadsheets and later transferred onto an Interactive Brokers letterhead.

104.    Such reports typically indicated Interactive Brokers in the heading and listed Ankor-Russia as the holder of a US dollar-nominated client account with QuantRiver Financial LLC.

105.    For instance, one such report dated October 31, 2017, shows purported holdings in US public stocks such as Automatic Data Processing, Aramark, Citigroup, and Comcast, with a total value of $37,170,987.

106.    In reality, a significant portion of client money was either never invested into U.S. publically traded companies as stated in the above reports or was so invested in the name of and for the benefit of Defendants and without regard to clients' interests.

107.    For instance, GL Algomatica, a Luxembourg-based fund, in which Defendant GLAM was a majority shareholder , as of March 16, 2018, held only $141,680 in its direct accounts with Interactive Brokers, despite the fund being referred to in Defendants' promotional materials as a successful regulated Luxembourg fund. The fund was eventually liquidated in early 2018.

108.    Internal reports prepared by Defendant Ankor pursuant to an investigation conducted by The Bank of Russia, indicated that, instead of statistical arbitrage and pair trading promoted by Defendants, a portion of investors' funds was simply held without trading in shares of stock of large US companies, such as Apple Inc, purchased through either Interactive Brokers or directly from Defendants' other clients who already held such stocks when they came to Ankor.

109.    For instance, although Plaintiff  Yusupov's agreement with Defendant Ankor provided for Ankor's investment of Yusupov's funds in US public stocks using statistical

arbitrage that entailed fairly frequent trades in pairs, Ankor 's internal books and reports showed that a substantial portion of Yusupov's funds was simply held in a static manner in the stock of a single company, Apple Inc., via International Brokers.

110.    In addition, Ankor's internal books and reports show that some of Plaintiff Yusupov's  funds were used to purchase Apple Inc.'s stock in private transactions from another Ankor client.

111.    For instance, on June 20, 2017, Ankor made a purchase of 6,408 shares of stock of Apple Inc., for a total of almost $1,000,000, from one Oleg Saplin, who is referenced as a "client" in one of Ankor's trade settlement statements.  The share purchase and sale agreement with Saplin was signed by Defendant Igor Lillevali.

112.    Similarly, on August 10, 2017, Ankor made a purchase of 6,439 shares of Apple stock totaling $1,000,000 from the same individual, Oleg Saplin.  This share purchase and sale agreement with Saplin was also signed by Defendant Igor Lillevali.

113.    Similarly, on September 29, 2017, Ankor made a purchase of 13,420 shares Apple stock totaling almost $2,000,000, from the same individual, Oleg Saplin.  This share purchase and sale agreement with Saplin was again signed by Defendant Igor Lillevali.

114.    Aside from the above purchases and others similar to them, a significant portion of client funds was used instead to pay employee salaries at all of the defendant entities, to effect client withdrawals, to finance Lillevali's other companies, including a medical center in Moscow and a travel agency and radio station in Cyprus, as well as to pay the salaries, asset and luxury purchases, and real estate development projects of the top executives, including the three Lillevali brothers.

115.    To the extent that some client funds were kept in brokerage accounts with Interactive Brokers, such funds were used for trades for Defendants' direct benefit and on Defendants' own accounts with Interactive Brokers directly or via Quant River Financial LLC, a Florida-based U.S. licensed broker-dealer with an account at Interactive Brokers.

116.    The entire operation of Defendant GLAM, which employed highly paid "portfolio managers" and "advisors" was financed solely with the funds supplied by Defendant FA pursuant to an agreement between Defendant GLAM and Defendant FA, which provided  for monthly payments of EUR 300,000 from Defendant GLAM to Defendant FA.

117.    When in 2017, Defendant FA stopped payments to Defendant GLAM, GLAM's CEO Daniel Ryf made urgent requests for money.  In his email dated November 30, 2017, addressed to Defendant Korytina, Ryf stated:

> **@Irina:** Irina, please let me also know what is maximum amount the group can send to the Swiss Company every month without any delay to cover the operational costs. This amount should come monthly and should be no problem to send every time so the Swiss company can cover the expenses. It makes then sense to adjust the

118.    In late 2017, Defendant Anna Lillevali made several payments to Defendant GLAM from Defendant FA's accounts.  For instance, on December 4, 2017, Anna Lillevali ordered a wire transfer in the amount of EUR 55,000 from Defendant FA's account at Ceskoslovenska obchodni banka (Czech Republic) to Defendant GLAM's account in Switzerland.

119.    Notably, investors were directed to make wire transfers to Defendants' accounts that were maintained at various banks located in Latvia, Cyprus, and the Czech Republic,

countries that are not well-known for stringent "know your customer" and anti-money laundering laws and procedures.

120.     For instance, in Latvia alone, two of the banks used by Defendants were sanctioned by the European regulator for participation in money laundering schemes.  Rietumu banka was fined in July 2017 in the amount of EUR 80 million and ABLV bank was forced into liquidation by the regulator in 2017.

121.     From Defendants' accounts in Latvia, Cyprus, and the Czech Republic, funds were then wired to other companies controlled by Lillevali, including those located in Hong Kong, Cyprus, Lithuania, Bulgaria and other countries.

122.     The banks used by Defendants to receive US dollars from investors and to pay investors in US dollars upon investors' withdrawal requests included, but were not limited to, VTB Bank (Russia, US correspondent bank Citibank, New York), Ceskoslovenska obchodni banka (Czech Republic, US correspondent banks JP Morgan Chase, Bank of New York Mellon, Deutsche Trust Company Americas (all in New York) ), RCB bank (Cyprus, US correspondent bank Citibank, New York), PPF Banka (Czech Republic, US correspondent bank Citibank, New York), RCB bank (Cyprus, US correspondent bank Citibank, New York).

123.     Defendants' monthly investment performance reports were generated based on backtesting, a process of applying a trading strategy or analytical method to historical data to see how accurately the strategy or method would have predicted actual results (i.e., simulated trading without using real funds).

124.     Such backtesting was performed using what is known in the industry as the statistical arbitrage models.

125.    The models were developed by the advisors employed by Defendant GLAM.

126.    The models were then sent to so-called "traders" at Defendants GL-Latvia and Ankor-Cyprus, who performed backtesting using Bloomberg terminals and then reported the results to their managers.

127.    Based on backtesting results, the managers created general monthly reports that were sent to the back office with a copy to Defendant Korytina.

128.    This practice went back as far as June 2015, which is evidenced by an email by one of Defendants' banks sent to Defendant Anna Lillevali requesting an explanation of Defendant GLAM's advisor's letter to the bank that alleged serious violations of the law at the entire group.

129.    The advisor's letter stated, in part: "The Swiss office has not personnel to conduct trades and serve bank accounts.  All so-called (by the back office employees) 'trading' is performed in Russia or elsewhere.  'Portfolio managers' in Switzerland send their instructions via chats and emails to Russia, and so-called back office creates 'trades.'"

130.    Based on the general monthly reports, the back office created individual reports for each investor client, and such a convoluted procedure created many errors that were noticed by both investors and "consultants" working with investors, and were hastily corrected by managers and back office employees.

131.    For instance, on January 22, 2016, manager Maksim Lukin reported to Defendant Korytina at her email irina@ankorinvest.ru: "As a result of rewriting the trade, a profit of $25,000 was booked."

132.    In a similar fashion, a monthly report prepared for Plaintiff Yusupov and dated November 2, 2017, was returned to the back office by the manager with a note "For Correction." Later, a corrected report was sent to Plaintiff Yusupov.

133.    When investors requested withdrawals of funds, such withdrawals were processed by back office employees or the back office manager Svetlana Getmanskaya, who consolidated such requests in one Excel spreadsheet that typically listed Defendants Ankor, FA and SNA, the names of the investors who had agreements with these Defendants, the amount of money contributed by investors, the amount of money to be returned, the payment method (cash, wire), and the expected date of return.  Such spreadsheets did not contain either the evidence of investors' purported holdings or any asset sale instructions to generate the funds to be returned.

134.    If the spreadsheets contained errors, they were returned by Getmanskaya to the sender with errors highlighted.  For instance, on September 26, 2017, Getmanskaya sent to Maksim Lukin a spreadsheet titled "Backoffice for Maksim correction of errors", which contained highlighted entries for Plaintiff Yusupov indicating under the same reference two different amounts, USD 1,000,000 and USD 1,007,000.

135.    Similar corrected or to be corrected entries were made in the same spreadsheet for several other investors.

136.    Upon correction, the spreadsheets were sent by Getmanskaya via email to Defendant Lillevali at gl@glfg.ch for his approval, with a copy to Defendant Korytina at ik@glfg.ch.

137.    Based on withdrawal reports, the back office created another set of spreadsheets containing internal monthly reports that indicated how much investors were paid by Defendants

-24-

and how much such investors initially paid Defendants, with no indication of any trades whatsoever.

138.    For instance, a report for December 2016 titled "Entry and exit of funds" indicated that in December 2016, Defendant FA received from investors $3,151,050 (including $199,993 from Plaintiff Pogosyan) while it paid back to investors $66,031 (including $10,750 attributable to Pogosyan).  Likewise, the report shows that in December 2016, Defendant SNA received from investors $964,132 while paying back to investors $641,945.

139.    When an investor made a withdrawal request, a "consultant" responsible for such investor would send an email to the back office urging the back office to pay as soon as possible. For instance, on February 8, 2018 consultant Sergey Ulanov sent the following email to the back office manager Getmanskaya: "Colleagues, according to the agreement, client Tarenov Murat Khalilovich must receive his money no later than this Friday (15 business days).  The amount is insignificant, only USD 11,164.  He wants to give us another USD 200K and is checking how we return the funds.  Please effectuate his withdrawal ASAP so that we would not lose fresh money from the client."

140.    When the amounts in particular accounts were insufficient to comply with withdrawal requests, back office managers would transfer funds among Defendants' various accounts in order to cover the deficiencies.   Occasionally, the managers paid their own money to the clients.

141.    For instance, on November 23, 2017, sales manager Denis Botnikov sent an email to the back office with the following request: "Please prepare an order for an internal transfer of USD 35,534 from spreads to Asset Management Russia.  Accordingly, we should convert USD

35,534 into rubles so that USD 650,000 is left in spreads and the rest we transfer to Asset

Management Russia. This must be done within the next 2 hours."

142.    On July 7, 2017, consultant Alexander Chinyaev sent an email to the back office

manager Getmanskaya, which stated: "As far as I understand, the funds have not been withdrawn

in a timely fashion.  I will compensate the client with $40,000 out of my personal funds.  I had to

cash in a certificate of deposit and lose interest.  I am sure our company is reasonable, and

therefore expect full compensation for lost interest and exchange rate."

143.    On May 17, 2018, Getmanskaya sent an email to back office employees with

instructions to create a detailed report for client Shishanov and a sample report indicating

Shishanov's "investment" of USD 2,500,000 and management and success fees.  This was in

response to an employee's email to Getmanskaya that stated: "We have to quietly ask the

consultant about this client (he's got lots of money), it looks like we did not do anything".

144.    On May 17, 2018, Getmanskaya received an email from the back office stating

"We only sent the client the report reflecting his payment, but the new report should reflect some

movement of the funds, and we have the same report at the end of the month. What should we

tell the client???"

145.    On May 16, 2018, in response to a consultant's request for copies of clients'

documents, Getmanskaya instructed the consultant to tell the clients that the documents are in

"the archive", which resulted in the following response from the consultant: "What do you mean

'in the archive'?  These are existing clients, what am I supposed to tell them?"

146.    Back office employees also falsified reports under the direction of one of the managers, Anna Savina (Bich), and Savina (Bich) gave employees instructions how to make corrections and falsify information in the same fashion as Getmanskaya.

147.    For instance, in response to The Bank of Russia request for production of clients' reports, Savina (Bich) sent an email from her address anna.bich@glfg.ch on December 12, 2017, to Defendant Korytina titled "Yashina corrected", which contained an Excel spreadsheet with a purported monthly report for client Elena Yashina.

148.    Also in response to the Bank of Russia request for production of clients' reports, Savina (Bich) on April 27, 2018 sent to back office employees an email stating that The Bank of Russia had discovered certain discrepancies in the reports. The email explained that "the real withdrawal was made from Ankor Invest but client Gorban was also included into this roster, even though the funds were transferred to him from another client (Akimenko)."

149.    Savina (Bich) also gave instructions to IT specialists to block select clients' access to internal accounts after the clients had made inquiries about their funds.  For instance, on May 10, 2018, Savina (Bich) sent an email to the IT department with a list of clients whose accounts should be blocked and instructing the "consultants" to tell the clients that the company experienced "technical problems."  In the same email, Savina (Bich) instructed the IT department to change the settings so that the client would see "Failure to Connect" instead of "Account Deactivated" in the description of the error.

150.    On November 22, 2017, Savina (Bich) sent an email to back office employees, which referenced the investigation by the Bank of Russia and stated: "There is a total of 77,973 shares, we are short 2,027 shares to make 80,000 shares, so we need to take 2,027 from inactive

individuals.  After our manipulations, I need reports for all months as they all will change...  At this time, I repeat, we have a request about Ankor Invest, the data are fine there. The most important thing is to show legal entities instead of the 2 individuals."

151.     The books of the back office showed that, as of March 1, 2018, the month when investors began demanding their money back to no avail, client "investments" in Defendant Ankor amounted to $41,943,512, in Defendant SNA $37,792,590, in Defendant FA $15,097,070.

152.     An email sent from the back office address backoffice@ankorinvest.ru to Defendant Korytina stated that the total amount due clients was $60,185,679.

153.     Despite the substantial amounts recorded on Defendants' books, Defendant GLAM ceased payments to its employees, providers, and tax and pension authorities in 2017, and on September 20, 2017, during the board meeting, Defendant GLAM's outside directors raised a concern about outstanding debts in the amount of CHF 1,100,000.

154.     The minutes of the meeting indicate that Defendant Lillevali explained to the outside directors that there were "technical problems with the banks" at Defendant FA.

155.     Despite Lillevali's explanations, on October 25, 2017, Defendant FA made from its account at RCB Bank (Cyprus) a wire transfer in the amount of EUR 169,851 to Monimo Ltd, ostensibly "for a partial payment of Stream Network Advisory [Defendant SNA] debt."

156.     In a similar fashion, on November 30, 2017, a payment of EUR 85,000 was made from Defendant SNA's account at Latvijas Pasta Bank (Latvia) to Defendant FA's account at RCB Bank (Cyprus) "for partial payment under SERVICES AGREEMENT for develop [sic] investment strategies and analysis of markets," even though Defendant FA had no employees to "develop strategies" and perform analysis.

157.     Similarly, Defendant Ankor's books recorded a transfer of EUR 450,000 to Defendant FA effected on August 09, 2017.

158.     Defendant Anna Lillevali, in her email to Defendant GLAM's outside directors, dated November 26, 2017, described how the funds were shuffled among Defendants' various accounts as follows: "As agreed on our call last Friday, by this e-mail we would like to give you a description of the transfer scheme.  The transfer to GL AM AG [Defendant GLAM] includes several steps which is a chain of transfers to other structures and after that the transfer will reach the account of GL AM AG."

159.     Defendants employed various tactics in order to deal with investors' complaints concerning non-fulfillment of requests for withdrawal of funds.

160.     On August 4, 2017,  in response to investor Petr Brazhnikov's demand for an explanation concerning the failure to return the entire investment, Defendant Lillevali sent to the investor a letter that contained the following explanations:

The difficult geopolitical situation with regards to Russia and Russian clients and ongoing investigation of the Russian individuals who were included in European and US sanctions lists. Requirements for disclosure of ultimate beneficial owners and confirmation of the source of funds have changed.
The number of documents moving from one financial structure to another has increased, and operations been made more difficult due to the issuance of new requirements of continuing improvements and updates to internal systems, in accordance with ever changing legislative norms.
There were technical problems relating to updating internal IT systems that caused an outage. Company specialists are working on the technical problems and the updates to the IT infrastructure, including adaptations to the new regulatory requirements concerning anti-money laundering and compliance and EU's General Data Protection Regulation.
The company cannot process documents and make wire transfers until the problems are resolved.

161.     These explanations were virtually identical to the explanations that the letters Plaintiffs received in June 2018, as detailed below.

162.    On November 16 2017, Defendant Ankor entered into a settlement agreement with investor Sergei Kuznetsov, in which Ankor agreed to pay Kuznetsov about USD 61,000 as principal and about USD 30,000 in damages (original amounts in Russian rubles) in exchange for Kuznetzov's withdrawal of a lawsuit that challenged Ankor's failure to return the investor's funds.

### Individual Defendants' Roles in the Enterprise

163.    Defendant German Lillevali was the mastermind of the entire enterprise and principal shareholder, beneficial owner, chief executive officer, or director in all of the Defendant companies, as well as the authorized signatory on Defendants' bank accounts.  He received copies of all emails among companies' managers and executives.

164.    Defendant German Lillevali executed sham "service agreements" on behalf of Defendants SNA and FA and sham "surety agreements" on behalf of Defendants GLAM and GLFG.  For instance, on October 15, 2015, Lillevali executed a "service agreement" with Plaintiff Ramanathan; on February 18, 2016, Lillevali executed a "service agreement" with Plaintiff Pogosyan; and on March 2, 2016, Lillevali executed a "surety agreement" with Pogosyan.

165.    Defendant German Lillevali promoted the enterprise by personally meeting with clients who indicated they would invest $1,000,000 or more and by giving interviews and publishing articles in financial and business media boasting about the financial group. For instance, on April 17,  2017, Lillevali  stated in an interview to Finews.com, a Swiss financial news internet resource: "We have 17 highly qualified staff, most of whom have more than 20

years of experience in leading financial investment institutions.  The GL Asset Management headquarters are in Zurich, and we also have offices in Geneva, London, Limassol and Munich." In a similar fashion, Lillevali published an article "Safe Strategy" on January 11, 2017 in the Russian edition of the Forbes magazine, where he touted the purported advantages of statistical arbitrage.

166.    Defendant Irina Korytina was the financial director of the enterprise, and on many occasions was referred to by Defendant German Lillevali as his right hand.

167.    Korytina was a shareholder, beneficial owner, or director in Defendants Ankor-Russia and Ankor-Cyprus, and in a number of other Russian and Cypriot companies that formed part of the enterprise.

168.    Korytina was the authorized on several bank accounts used by the enterprise, including the accounts of Defendant GL-Latvia and GL Finance (UK).

169.    Korytina received copies of all emails among companies' managers and executives, corrected and approved all internal financial reports, gave instructions for and approved falsified reports, and dealt with "problematic" clients who demanded the return of their funds, among other things.

170.    Defendant Anna Lillevali was the manager of operation of the enterprise, received copies of all managers' and executives' emails, and gave instructions to the back office and managers, including directions to falsify reports and instructions on how to do so.

171.    Anna Lillevali was a shareholder and beneficial owner of OOO GL Finansovaya Gruppa (Moscow, Russia), the second Russian licensed broker-dealer company in the enterprise.

172.    Anna Lillevali was the authorized signatory on several bank accounts, including the accounts of Defendants GLAM, GL-Latvia, FA, SNA and Cypriot companies Linesit Corp Ltd, Kiprinform, Gynura Line Exclusive Ltd, and made payment orders for transfers of funds from accounts of Defendants FA and SNA.

173.    Defendant Oleg Lillevali was a shareholder in and beneficial owner of Defendant Ankor-Russia, and Director of Defendants SNA and GL-Latvia.

174.    Oleg Lillevali executed sham "service agreements" on behalf of Defendant SNA, including the October 13, 2017 addendum to the "service agreement" with Plaintiff Ramanathan.

175.    Oleg Lillevali participated in the diversion of clients' funds to Defendants' real estate development projects in Cyprus and subsequent laundering of converted funds through the sale of the projects.  For instance, on February 7, 2017, Oleg Lillevali executed in his personal capacity an agreement with Cypinform Real Estate Ltd, a company controlled by Defendant German Lillevali, in which Oleg Lillevali undertook to promote and sell the properties developed by Cypinform Real Estate in exchange for a commission of 20% of the sale price.

176.    Defendant Igor Lillevali was Director of Defendant SNA and CEO of Defendant Ankor, and in these capacities executed sham "service agreements" with investors. For instance, on December 1, 2017, Igor Lillevali executed on behalf of Ankor an addendum to the "service agreement" with Plaintiff Yusupov, which guaranteed Yusupov return of $7,700,000.

177.    Igor Lillevali was a shareholder, beneficial owner, Director and CEO of Exsulo, an Estonian company that formed part of the enterprise and was one of many companies to which the investors' funds were diverted.

## INDIVIDUAL PLAINTIFFS' ALLEGATIONS

### Krishnan Ramanathan

178.    Plaintiff Krishnan Ramanathan ("Ramanathan") is a US citizen who currently resides in Basel, Switzerland.

179.    Prior to moving to Switzerland, Ramanathan accumulated substantial savings in his US bank account at Citibank, including the qualified tuition plan under Section 529 of the Internal Revenue Code to provide savings for his two children's education.

180.    In addition, Ramanathan plans to return to the U.S. in 3 to 4 years, and for this purpose, he has saved and accumulated funds in his US bank account.

181.1.  Prior to moving to Switzerland, Ramanathan sold his house in Boston, and deposited $30,000 of the proceeds to his Swiss bank account, from which he then made a financial investment through Defendant SNA.

182.    Ramanathan also used the funds from his US bank account at Citibank to pay US taxes, including the taxes on the phantom income he received on paper for his "investments" with Defendants.  For instance, Ramanathan paid US taxes in the amount of $28,162 in 2015 and $38,196 in 2016 from this bank account, a portion of which is attributable to the income Ramanathan supposedly gained from his "investments" with Defendants.

183.    On September 9, 2015, Ramanathan was contacted via the LinkedIn website by Olga Goryunova, a "consultant" and a sales rep from Defendant Ankor, who offered him what she characterized as a "new and safe investment strategy."

184.    On September 22, 2015, Ramanathan met in person with Olga Goryunova and another Ankor "consultant", Nikita Zonin, in Ramanathan's office in Moscow, Russia, where the

two "consultants" explained to Ramanathan in more detail an investment strategy that included statistical arbitration, investment in stocks of large US public companies, and an alleged safe return on investment of up to 12% per annum.

185.    On October 13, 2015, the "consultants" provided Ramanathan a services agreement with Defendant SNA. The agreement bore the logos of "Stream Network" and "GL Financial Group."

186.    The signature for Defendant SNA appears as "Director G. Lillevyali" and bears a seal of Defendant SNA. The agreement contained the following description of services:

1.2.  The Company shall provide to the Client the following services (the "Services"):
    1.2.1.  research and execution of investment decisions;
    1.2.2.  assessment of investment feasibility;
    1.2.3.  investment consulting;
    1.2.4.  assistance in developing and executing financial projects;
    1.2.5.  Software development and implementation, including those used for work in the financial markets

187.    An appendix to the service agreement stipulated a management fee of 1.5% of the total amount of investment and a success fee of 20% of the increase in portfolio value.

188.    Both the management fee and the success fee were to be paid on a monthly basis.

189.    Plaintiff Ramanathan also executed a separate surety agreement with Defendant GL Asset Management (GLAM), which provided that Defendant GLAM is jointly liable for the nonperformance or improper performance of Defendant SNA's obligations. The signature line for Defendant GLAM states "G. Lillevyali".

190.    On October 22, 2015, Ramanathan made a payment in the amount of $100,000 from his account at UBS bank (Switzerland) to Defendant SNA's account at Hellenic Bank (Cyprus).

191.    On August 29, 2016, Ramanathan made a payment in the amount of $100,000 from his account at UBS bank (Switzerland) to Defendant SNA's account at PPF Bank (Czech Republic).

192.    In October 2017, Ramanathan was told by the "consultants" that he would receive a discount on the success fee if he made an additional investment.

193.    On October 16, 2017, Ramanathan made an additional payment in the amount of $100,000 from his account at UBS bank (Switzerland) to Defendant SNA's account at PPF Bank (the Czech Republic).

194.    On October 18, 2017 Ramanathan executed an addendum to the agreement, which reduced the success fee to 18% per annum.

195.    Throughout the same period of time, Plaintiff Ramanathan was receiving from Defendant SNA periodic monthly statements of account. A typical report included such items as "Portfolio Market Value," "Success Fee", "Broker Fee", and "Exchange Fee,", and listed about 40 names of large US public companies such as Apple Inc., Automatic Data Processing Inc., Expedia Inc., NIKE Inc., Under Armour Inc. etc.

196.    The Portfolio Market Value item was usually several thousand dollars more at the end of the month than that at the beginning of the month, giving an impression of steady growth of the portfolio.

197.    In March 2018, the "consultants" recommended that Ramanathan withdraw his funds due to some "problems" within the company.

198.    On March 20, 2018, Ramanathan submitted, via email to Defendants' addresses at receptionnikolskaya@glfg.ch and info@glassetmanagement.ch , a request for withdrawal and

received no response or explanation.  When Ramanathan contacted both of his "consultants,"
each told him they no longer worked for the company and referred him to another "consultant,"
Nodira Sadikova.  That "consultant" likewise failed to provide any explanation for the absence of
any action taken on Ramanathan's withdrawal request.

199.    Ramanathan then flew to Moscow from Switzerland to visit Defendant Ankor's
office, only to find an abandoned and empty office space. Ramanathan also attempted to contact
Defendant GLAM's CEO Daniel Ryf and one of its advisors, Siegfried Spitzer, and found out
that those individuals no longer worked for GLAM.

200.    In June 2018, Ramanathan caused the filing of a criminal complaint in
Switzerland against Defendant GLAM, Defendant GL and Defendant SNA. The criminal
complaint is currently pending.

201.    To date, Ramanathan has not received either his funds or any communication
from any of the Defendants.

**Tigran Pogosyan**

202.    Plaintiff Tigran Pogosyan (Pogosyan) is a citizen of Armenia and Russia, and a
resident of Moscow, Russia.

203.    In February 2016, Pogosyan was approached by Arnold Magakian, a "consultant"
at Defendant Ankor.  Magakian had obtained information about Pogosyan and his substantial
assets from Magakian's sister who worked at a bank where Pogosyan had an account.

204.    On February 2, 2016, Pogosyan met with Magakian at Defendant Ankor's office
in Moscow.  Magakian presented to Pogosyan an investment strategy that included statistical

arbitration, investment in stock of large US public companies, and an allegedly safe return on investment of up to 12 % per annum.

205.    On February 4, 2016, Pogosyan received an email from Magakian containing a description of statistical arbitration, examples of "past performance," and form agreements for services and surety with Defendants Ankor- Russia, FA, and GLAM. The agreements listed Ankor's account at VTB Bank (Russia) and FA's accounts at Ceskoslovenska Obchodni Banka (Czech Republic) and RCB bank (Cyprus).  Magakian's message indicated that withdrawals of the funds would take no more than 15 days, and 3-5 days in practice in most instances.

206.    Plaintiff Pogosyan also met with "advisors" from Defendant GLAM, Andrey Nefedov and Petar Bozhinov, both in person at Defendant Ankor's office in Moscow and via videoconference.  Both "advisors" assured Pogosyan that statistical arbitration was a safe and profitable strategy, that Defendant Lillevali was a successful financier who led the entire operation, and that Defendant GLAM was a 100-year-old Swiss finance firm.

207.    The same information was "confirmed" by "consultant" Magakian who later admitted in writing that he was instructed by Defendants Lillevali and Korytina to make such statements to all prospective clients.

208.    On February 18, 2016, Magakian gave Pogosyan a services agreement with Defendant FA.  The agreement contained the following description of services: "The Company shall manage the assets on behalf of the Client in order to increase Assets value". The signature line for Defendant FA stated "Director G. Lillevyali."

209.     Pogosyan executed the agreement at Defendant Ankor's office and gave it to Magakian, who subsequently furnished Pogosyan a copy of the agreement signed by Lillevali and bearing the seal of FA.

210.     The service agreement stipulated a management fee of 1.5% of the total amount of the investment and a success fee in the amount of 20% of the increase in portfolio value. Both management fee and success fee were to be paid on a monthly basis.

211.     On February 18, 2016, Pogosyan executed an addendum to the services agreement, which guaranteed a refund of his $100,000 investment after it has been "managed" for one year.

212.     On March 2, 2016, Pogosyan executed a surety agreement with Defendant GLAM, which provided that Defendant GLAM would be jointly liable for the nonperformance or improper performance of Defendant FA's obligations to Pogosyan.  The signature line for Defendant GLAM stated "Director G. Lillevyali."

213.     On March 9, 2016, Pogosyan made a payment of $104,157.49 from his account at Citibank (UK) to Defendant FA's account at Ceskoslovenska Obhodni Banka (Czech Republic).

214.     On September 21, 2016, Pogosyan made payments totaling $200,000 from his accounts at Sberbank (Russia) and Raiffeisenbank (Russia) to Defendant FA's account in the Czech Republic.

215.     In December 2016, Magakian told Pogosyan that Pogosyan would receive a discount on the success fee if he made an additional investment.

216.     On December 22, 2016, Pogosyan made a payment of $199,993.50 from his account at Raiffeisenbank (Russia) to Defendant FA's account in the Czech Republic.

217.    On December 26, 2016, Pogosyan executed an addendum to the agreement, which further the success fee to 15% per annum.

218.    In November 2017, Magakian told Pogosyan that Pogosyan would receive a further discount on the success fee if Plaintiff TP made additional investment.

219.    On November 22, 2017 - Pogosyan executed an addendum to the agreement, which reduced the success fee to 12% per annum and guaranteed the return of Pogosyan's total investment in the amount of $717,869.

220.    On November 22, 2017, Pogosyan made a payment of $200,000 in cash to the cashier at Defendant Ankor's office and received a receipt from the cashier.

221.    From December 2016 through August 2017, upon Pogosyan's requests, Defendant FA made periodic payments to him on a monthly basis of purported "returns on investment" from its account at RCB Bank (Cyprus) to Pogosyan's account at Ameriabank (Armenia). The total amount so paid to Plaintiff Pogosyan was USD 47,041.

222.    Pogosyan was also receiving from Defendant FA monthly statements of account. A typical report included such items as "Portfolio Market Value," "Success Fee," "Broker Fee," and "Exchange Fee," and listed about 40 names of large US public companies.  The Portfolio Market Value was usually several thousand dollars more at the end of the month than at the beginning of the month, giving an impression of steady growth.

223.    In March 2018, Magakian recommended to Pogosyan that he withdraw his funds from FA due to some "problems" within the company.

224.     On April 19, 2018, Pogosyan came to Ankor's office in Moscow and handed to Elena Melnik, an Ankor employee, a written demand for withdrawal of all funds in the amount of US 705,292.19 (including not-yet-paid purported earnings).

225.     In June 2018, Magakian informed Pogosyan that the Bank of Russia revoked Defendant Ankor's license and that Defendant Lillevali's investment business was now managed by OOO GL Finance in Moscow.  Pogosyan called and sent messages to Lillevali's phone numbers but received no response.

226.     On June 6, 2018, Pogosyan met with Maxim Zakradze, CEO of OOO GL Finance, in their office in Moscow.  Pogosyan repeated his demand for return of his funds, and Zakradze promised to inform Lillevali about this demand since, according to Zakradze, Lillevali "was no longer talking to clients."

227.     On June 18, 2018, Pogosyan received an email message from financial.alliance.bz@gmail.com, the same address from which he was receiving FA's monthly reports.  The message was signed "Financial Alliance Limited" and contained the following explanation of the reasons for non-return of Pogosyan's funds:

The difficult geopolitical situation with regards to Russia and Russian clients and ongoing investigation of the Russian individuals who were included in European and US sanctions lists. Requirements for disclosure of ultimate beneficial owners and confirmation of the source of funds have changed.
The number of documents moving from one financial structure to another has increased, and operations been made more difficult due to the issuance of new requirements of continuing improvements and updates to internal systems, in accordance with ever changing legislative norms.
There were technical problems relating to updating internal IT systems that caused an outage. Company specialists are working on the technical problems and the updates to the IT infrastructure, including adaptations to the new regulatory requirements concerning anti-money laundering and compliance and EU's General Data Protection Regulation.
The company cannot process documents and make wire transfers until the problems are resolved.

228.    Pogosyan was not included in any EU or US sanctions list.

229.    In dealing with FA, Pogosyan used the same personal bank account of which he was the sole owner.

230.    EU's General Data Protection Regulation was adopted and published in 2016, i.e. two years prior to coming into effect in May 2018.

231.    On June 21, 2018, Pogosyan sent certified letters with his demand for payment to Defendant FA's registered address in Belize, Defendant GLAM's registered address in Zurich, Switzerland, and Defendant Lillevali's address in Cyprus. To date, Pogosyan has received no response.

232.    On July 23, 2018, Pogisan visited Defendant GL-Latvia's office in Riga, Latvia. The office was closed.  Pogosyan met with the landlord's representative, who informed Pogosyan Defendant GL-Latvia had to be out of its office due to unpaid rents in the amount of EUR 17,000.

233.    In September 2018, Pogosyan, with other co-plaintiffs, caused the filing of a criminal complaint in Tallinn, Estonia against Defendants German Lillevali, Anna Lillevali, Igor Lillevali, and Oleg Lillevali, all Estonian citizens.  The complaint is currently pending.

234.    In October 2018, Pogosyan, with several other co-plaintiffs, caused the filing of a criminal complaint in Moscow, Russia against Defendants Ankor and German Lillevali. The complaint is currently pending.

235.    To date, Pogosyan has not received either his funds or any communication from any of the Defendants.

**Dmitry Koryukin**

236.    Plaintiff Dmitry Koryukin ("Koryukin") is a citizen of Russia and a resident of Moscow, Russia. In October 2015, he was approached by one Denis Titov, an Ankor "consultant," whom Koryukin knew through mutual friends.

237.    October 29, 2015, Koryukin met with Titov to discuss investment terms and investment strategy.  Titov explained to Koryukin the investment strategy that included statistical arbitration, investment in stocks of large US public companies, and an alleged safe return on investment of up to 12 % per annum.

238.    November 2, 2015, Koryukin received an email from Titov containing a services agreement with Defendant SNA and a surety agreement with Defendant GLAM, both with "G. Lillevyali" on the signature line.  The surety agreement contained a clause that authorized transfer of funds by Defendant SNA to Defendant GLAM.

239.    On November 9, 2015, Koryukin met with Titov and signed the services agreement and the surety agreement.

240.    On November 10, 2015, Koryukin made a payment of $140,000 from his account at Raiffeisenbank (Moscow, Russia) to Defendant SNA's account at Hellenic Bank (Cyprus).

241.    On January 25, 2016, Koryukin made a payment of $120,000 from his account at Raiffeisenbank (Moscow, Russia) to Defendant SNA's account at Hellenic Bank (Cyprus).

242.    On March 24, 2016, Koryukin met with Titov at Ankor's offices and had a videoconference with Bogdan Zgersky, an "advisor" from Defendant GLAM.  Both Titov and Zgersky confirmed that the strategy was working and was producing steady returns.

243.     In May 2016, Koryukin received a report from SNA showing steady growth of portfolio value.  Based on this report, Koryukin made a decision to make an additional investment.

244.     On May 20, 2016, Koryukin made a payment of $350,000 from his account at Raiffeisenbank (Moscow, Russia) to Defendant SNA's account at PPF Bank (the Czech Republic).

245.     On February 3, 2017, Koryukin received an email message from Titov, boasting about the company's performance and attaching an article in Forbes Russia about Defendant Lillevali and a statement about the Financial Olympus award given to Defendant Ankor.

246.     Koryukin was receiving from SNA monthly statements of account. A typical report included such items as "Portfolio Market Value," "Success Fee," "Broker Fee," and "Exchange Fee", and listed about 40 names of large US public companies.  Portfolio Market Value at the end of the month was usually several thousand dollars more than at the beginning of the month, creating an impression of steady growth.

247.     In April 2018, Titov suggested that Koryukin withdraw his funds due to some unspecified "problems" within the company.

248.     On May 10, 2018, Koryukin came to Ankor's office in Moscow and gave Elena Melnik, an Ankor employee, two written demands for withdrawal of his funds, in the amounts of $327,537.13 and $425,768.97, respectively (based on the March 2018 report and including non-yet-paid purported earnings).

249.    On June 18, 2018, Koryukin received an email message from SNA. The message was signed "Stream Network Advisory Limited" and listed the following reasons for the absence of any action taken on Koryukin's requests for withdrawal:

The difficult geopolitical situation with regards to Russia and Russian clients and ongoing investigation of the Russian individuals who were included in European and US sanctions lists.
Requirements for disclosure of ultimate beneficial owners and confirmation of the source of funds have changed.
The number of documents moving from one financial structure to another has increased, and operations been made more difficult due to the issuance of new requirements of continuing improvements and updates to internal systems, in accordance with ever changing legislative norms.
There were technical problems relating to updating internal IT systems that caused an outage.
Company specialists are working on the technical problems and the updates to the IT infrastructure, including adaptations to the new regulatory requirements concerning anti-money laundering and compliance and EU's General Data Protection Regulation.
The company cannot process documents and make wire transfers until the problems are resolved.
250.    Koryukin was not included in any EU or US sanctions list.

251.    In dealing with SNA, Koryukin used the same personal bank account of which he was the sole owner.

252.    To date, Koryukin has not received either the funds or any other communication from any of the Defendants.

**Ramazankadi Yusupov**

253.    Plaintiff Ramazankadi Yusupov ("Yusupov") is a citizen of Russia and a resident of Moscow, Russia.

254.    In May 2017, Yusupov was approached by Arnold Magakian, a "consultant" at Defendant Ankor, with a proposal of a safe investment strategy that was based on statistical arbitrage.

255.    Later in May 2017, Yusupov met with Magakian at Ankor's office in Moscow, Russia.  Magakian presented to Yusupov an investment strategy that included statistical arbitration, investment in stock of large US public companies, and an allegedly safe return on investment of up to 9 -11 % per annum.

256.    By the end of May 2017, Yusupov received an email from Magakian containing a description of statistical arbitration, examples of "past performance," and form agreements for broker, services, and surety with Defendants Ankor and GLAM.

257.       Yusupov also met with "advisors" from Defendant GLAM: Andrey Nefedov, at Defendant AI's office in Moscow, and Petar Bozhinov, at GL Finance UK's office in London. Both "advisors" assured Yusupov that statistical arbitration was a safe and profitable strategy, that Defendant Lillevali was a successful financier who led the entire operation, and that Defendant GLAM was a 100-year-old Swiss firm.  The same information was affirmed by "consultant" Magakian who later admitted in writing that he was given by Defendant GL and Defendant Irina Korytina instructions to make such statements to all prospective clients.

258.     Yusupov then met with Defendant Lillevali, who assured and told Yusupov that the investment was safe and that Lillevali would personally guarantee its return.

259.    On June 8, 2017, Yusupov executed the broker service agreement with Defendant Ankor at its office in Moscow and the surety agreement with Defendant GLAM. Both agreements bore logos of Ankor and GLAM. The signature line for GLAM stated "G. Lillevali".

260.    The broker service agreement stipulated a management fee of 1.5% of the total amount of the investment and a success fee of 20% of the increase in portfolio value. Both the management fee and the success fee were to be paid on a monthly basis.

261.    In June 2017, Yusupov executed an addendum to the broker services agreement, which guaranteed a refund of his investment of $1,000,000 after it has been "managed" for one year and reduced the success fee to 15%.

262.    Subsequently, Yusupov executed another addendum to the broker services agreement, which guaranteed a refund of $2,000,000 and reduced the success fee to 12%.

263.    On June 16, 2017, Yusupov made a payment of $1,000,000 from his account at SNGB Bank (Russia) to Defendant Ankor's account at VTB Bank (Russia).

264.        On August 8, 2017, Yusupov made a payment of $1,000,000 from his account at SNGB Bank (Russia) to Ankor's account at VTB Bank (Russia).

265.    In September 2017, Magakian suggested that Yusupov should increase his investment on condition that Yusupov would receive an additional guarantee of return of investment and the success fee would be further reduced to 9%.

266.    On September 29, 2017, Yusupov executed one more addendum to the broker services agreement, which guaranteed the refund of $4,000,000.

267.    On September 29, 2017, Yusupov made a payment of $2,000,000 from his account at SNGB Bank (Russia) to Ankor's account at VTB Bank (Russia).

268.    In November 2017, Defendant Lillevali convinced Yusupov to make an additional investment on condition that Defendant Lillevali would guarantee the entire amount of Yusupov's investment and that the success fee would be further reduced to 7% while the management fee would be reduced to 1%.

269.    On November 28, 2017, Yusupov made a payment of $3,700,000 from his account at SNGB Bank (Russia) to Ankor's account at VTB Bank (Russia).

270.    On December 1, 2017, Yusupov executed yet another addendum to the broker agreement with Ankor, which guaranteed the return of $7,700,000 and reduced the success fee to 7% and the management fee to 1%. The addendum was executed by Defendant Igor Lillevali in his capacity as General Director of Ankor.

271.    On two occasions, upon Yusupov's request, Defendant Ankor made payments of the purported "returns on investment" to Yusupov's account.  In September 2017, Ankor paid Yusupov $56,944, and in January 2018, $104,936.

272.    Prior to Defendants' cutting all communications with Yusupov, his funds were kept in a U.S. brokerage account in the form of U.S. publicly traded stocks.

273.    In March 2018, Magakian suggested that Yusupov withdraw his funds due to some unspecified "problems" within the company.

274.    On April 13, 2018, Yusupov received a certificate from Ankor stating that Ankor held $8,108,315.67 in Yusupov's brokerage account at Ankor.

275.    On April 17, 2018, Yusupov delivered to Ankor a demand for the return of the entire amount of USD 8,108,315.67, as stated in the certificate.

276.    To date, Yusupov has not received either the funds or any communication from any Defendants.

**Alexey Khomyakov**

277.    Plaintiff Alexey Khomyakov ("Khomyakov) is a citizen of Russia and a resident of Moscow, Russia.

278.     In October 2014, Khomyakov was approached by Anton Lashchenov, a "consultant" at Ankor.  Lashchenov formerly was Khomyakov's account manager at Russian Standard Bank and then came to work for Ankor.

279.     Khomyakov initially referred his wife, Plaintiff Svitlana Shcherbakova, to Lashchenov, and Shcherbakova executed a service agreement with Defendant SNA and a surety agreement with Defendant GLAM.

280.     Khomyakov attended all the meetings between Shcherbakova and Ankor's and GLAM's "consultants" and "advisors", as well as with Defendants German Lillevali and Oleg Lillevali.  During every meeting, these Defendants emphasized the safety of the investment strategy, as well as the promised yield performance and return of funds on demand.

281.     The monthly reports sent by Ankor to Shcherbakova showed a steady growth of the portfolio value. Khomyakov was impressed by the reports and decided to make his own investments.

282.     On March 21, 2017, Khomyakov met with Ankor's Executive Director Vladimir Mikhailov at the Ritz Carlton hotel in Moscow.  Mikhailov brought a service agreement with Defendant SNA, already executed by Defendant Igor Lillevali, and the surety agreement with Defendant GLAM already executed by Defendant German Lillevali.

283.     Khomyakov executed both agreements. The surety agreement contained a clause authorizing transfer of funds by Defendant SNA to Defendant GLAM.

284.     The service agreement contained the following description of services:

1.2. The Company shall provide to the Client the following services (the "**Services**"):
   1.2.1. research and execution of investment decisions;
   1.2.2. assessment of investment feasibility;
   1.2.3. investment consulting;
   1.2.4. assistance in developing and executing financial projects;
   1.2.5. Software development and implementation, including those used for work in the financial markets

285.    An appendix to the service agreement stipulated a management fee of 1.5% of the total amount of the investment and a success fee of 20% of the increase in portfolio value. Both management fee and success fee were to be paid on a monthly basis.

286.    On April 20, 2017, Khomyakov made a payment of $174,746 from his account at Raiffeisenbank (Moscow, Russia) to Defendant SNA's account at Latvijas Pasta bank (Latvia).

287.    On June 15, 2017, Khomyakov made a payment of $69,750 from his account at Raiffeisenbank (Moscow, Russia) to Defendant SNA's account at Latvijas Pasta bank (Latvia).

288.    Subsequently, Khomyakov began to receive from Defendant SNA monthly statements of account. A typical report included such items as "Portfolio Market Value", "Success Fee", "Broker Fee", and "Exchange Fee", and listed about 40 names of large US public companies.

289.    Portfolio Market Value at the end of the month was usually several thousand dollars more than at the beginning of the month, creating an impression of steady growth.

290.    In September 2017, Khomyakov was again approached by Mikhailov, who pointed out the performance Khomyakov's portfolio and suggested for Khomyakov to invest additional funds, and Khomyakov agreed.

291.    September 26, 2017, Khomyakov met with Mikhailov, who brought an asset management agreement with Defendant FA already signed by Defendant Lillevali and the surety

agreement with Defendant GLFG, also already signed by Lillevali.  Khomyakov signed both agreements.

292.    On November 7, 2017 - Khomyakov made a payment of $99,550 from his account at Raiffeisenbank (Moscow, Russia) to Defendant FA's account at RCB Bank (Cyprus).

293.    November 7, 2017 - Khomyakov also made a payment of $79,750 from his account at Raiffeisenbank (Moscow, Russia) to Defendant FA's account at RCB Bank (Cyprus).

294.    In April 2018, Mikhailov recommended that Khomyakov withdraw his funds due to some "problems" within the company.

295.    Khomyakov submitted his request for withdrawal per standard procedure, but to date, has not received either the funds or any communication from any Defendants.

296.    In September 2018, Khomyakov with other co-plaintiffs caused the filing of a criminal complaint in Tallinn, Estonia against Defendant German Lillevali, Defendant Anna Lillevali, Defendant Igor Lillevali, and Defendant Oleg Lillevali, all Estonian citizens.

**Svitlana Shcherbakova**

297.    Plaintiff Svitlana Shcherbakova ("Shcherbakova") is a citizen of Ukraine and a resident of Moscow, Russia.

298.    Shcherbakova learned about Ankor and German Lillevali from her husband, Plaintiff Khomyakov, who in October 2014 was approached by Anton Lashchenov, an employee at Ankor.

299.    Lashchenov formerly was Khomyakov's account manager at Russian Standard Bank and later came to work for Ankor.

300.     Shcherbakova met with Lashchenov, who presented to her an investment strategy that included statistical arbitration, investment in stocks of large US public companies, and an allegedly safe return on investment of up to 11% per annum.

301.     Lashchenov emphasized the safety of the investment strategy, the return of funds on demand, and Defendant German Lillevali's highest integrity and honesty.

302.     On October 31, 2014, Shcherbakova came to Ankor's office in Moscow, Russia to sign agreements. The service agreement with Defendant SNA bore the logos of "Stream Network" and "GL Financial Group".  The signature line for Defendant SNA stated "Director G. Lillevyali" and bore a seal of Defendant SNA. The agreement contained the following description of services:

1.2.  The Company shall provide to the Client the following services (the "Services"):
   1.2.1.  research and execution of investment decisions;
   1.2.2.  assessment of investment feasibility;
   1.2.3.  investment consulting;
   1.2.4.  assistance in developing and executing financial projects;
   1.2.5.  Software development and implementation, including those used for work in the financial markets

303.     The appendix to the service agreement stipulated a management fee of 1.5% of the total amount of the investment and a success fee of 20% of the increase in portfolio value. Both management fee and success fee were to be paid on a monthly basis.

304.     A separate surety agreement was executed between Shcherbakova and Defendant GLAM, and provided that GLAM would be jointly liable for nonperformance or improper performance of Defendant SNA's obligations. The signature line for Defendant GLAM stated "G. Lillevyali".

305.     Between October 2014 and September 2016, Shcherbakova had a number of meetings with "consultant" Lashchenov who was subsequently replaced by "consultant" Denis

Titov and Ankor's Executive Director Vladimir Mikhailov.  In every meeting, Ankor's employees confirmed to Shcherbakova the soundness of the statistical arbitrage strategy and the safety of Shcherbakova's investment.  In one of the meetings, "advisor" Andrey Nefedov showed Shcherbakova various charts purportedly summarizing Ankor's past performance and up to 12% per annum return on investment.

306.    Plaintiff SS also met with Defendants German Lillevali and Oleg Lillevali, who also confirmed the statements and promises made in the agreements and those made by Ankor employees.

307.    Plaintiff then began to receive from Defendant SNA monthly statements of account. A typical report included such items as "Portfolio Market Value" at the beginning and the end of the month, "Success Fee", "Broker Fee" and "Exchange Fee", and listed about 40 names of large US public companies.

308.    Portfolio Market Value at the end of the month was usually several thousand dollars more than at the beginning of the month creating an impression of steady growth.

309.    In April 2018, Mikhailov recommended that Shcherbakova withdraw her funds due to some unspecified "problems" within the company.

310.    The April 2018 statement dated May 2, 2018, indicated that Shcherbakova's total portfolio value, including case and U.S. stocks, was $502,404.

311.    Shcherbakova then submitted her request for withdrawal of the $502,404 per standard procedure, but to date, has not received either the funds or any communication from any Defendant.

## FIRST CLAIM FOR RELIEF: RICO VIOLATIONS
### (§1962(c) against all natural-person Defendants)

312.    Plaintiffs re-allege and incorporate herein all the preceding paragraphs.

313.    The natural person Defendants individual defendants named herein were and are

conducting an enterprise consisting primarily of: (a) the Ankor-Russia and Ankor-Cyprus

entities collecting funds for "investment" form the general public, (b) the FA and SNA entities as

purported trading and investment entities supposedly conducting investment and trading

operations to obtain a profit on the investments collected, and (c) the GLAM and GL-Latvia

entities ostensibly guaranteeing the return-on-investment performance of FA and SNA.

314.    Other entities, including certain Swiss entities described previously, also

participated in the enterprise by creating an appearance of large Swiss-based financial

conglomerate, by obscuring the identity of any particular responsible party with respect to an

individual investor, and by shuffling client finds among different entities to facilitate the work

flow of the Ponzi scheme.

315.    The individual defendants conducted the above-described enterprise through a

pattern of unlawful and illegal activity, including: making false written and oral promises that

clients' funds would be invested in the U.S. stock market for such clients' benefit and invested

using statistical arbitrage models of investment, using client funds to pay salaries of executives

and employees of the enterprise and to pay for various luxury purchases and various projects that

had nothing to do with investing in the stock market using statistical arbitrage, using newer

clients' funds to pay up on withdrawal requests by older clients, generating and disseminating to

clients false investment performance reports that were based not on actual investment and performance, but on backtesting and other simulated trading not involving actual investments.

316.    The unlawful and illegal activity described earlier herein constituted mail fraud, wire fraud, common law fraud, and money laundering, among other things.

317.    The unlawful and illegal activity described earlier herein was not a one-time occasion, but a consistent pattern spanning over several years of collecting and diverting funds obtained from the general public under the ostensible and false purposes of statistical arbitrage-based investment in the stock market.

318.    The unlawful and illegal activity described herein affected both foreign and interstate commerce.

319.    The overwhelming majority of the monetary transactions performed in furtherance of the enterprise and its scheme was performed in U.S. dollars and using correspondent banks based, located, and headquartered in the United States.

320.    As a result of the above-described conduct of the enterprise through a pattern of unlawful and illegal activity, each Plaintiff suffered an injury to such Plaintiff's property located in the United States.

321.    Specifically, Plaintiff Ramanathan so lost at least $50,000 out of the funds he kept in a U.S. bank account, and all of his holdings totaling $300,000 in the form of U.S. stock shares held in custodial accounts at U.S. Banks and in the form of cash he paid and was unable to have refunded from the IRS.

322.    Plaintiff Pogosyan so lost all of his holdings totaling $704,150 in the form of U.S. stock shares held in custodial accounts at U.S. Banks.

-54-

323.   Plaintiff Koryukin so lost all of his holdings totaling $760,166 in the form of U.S. stock shares held in custodial accounts at U.S. Banks.

324.   Plaintiff Yusupov so lost all of his holdings totaling $8,108,315 in the form of U.S. stock shares held in custodial accounts at U.S. Banks.

325.   Plaintiff Khomyakov so lost all of his holdings totaling $423,796 in the form of U.S. stock shares held in custodial accounts at U.S. Banks.

326.   Plaintiff Shcherbakova so lost all of her holdings totaling $502,404 in the form of U.S. stock shares held in custodial accounts at U.S. Banks.

## SECOND CLAIM FOR RELIEF: RICO VIOLATIONS
### (§1962(d) against all natural-person Defendants)

327.   Plaintiffs re-allege and incorporate herein all the preceding paragraphs.

328.   Each natural person Defendant (individual Defendant) conspired with at least one other such Defendant to effectuate the scheme described above.

329.   Each such Defendant knew of the unlawful acts (including non-investment of funds, paying older clients with newer clients' funds, and generating false monthly reports) of at least one other individual Defendant.

330.   Each such Defendant knew that such Defendant was part of a larger enterprise collecting funds from the public and diverting those funds for such Defendant's personal gain.

331.   As a result of said conspiracy, Plaintiff Ramanathan suffered injury and damages, approximately in the amount of $350,000.00.

332.   As a result of said conspiracy, Plaintiff Pogosyan suffered injury and damages, approximately in the amount of $704,150.

333.    As a result of said conspiracy, Plaintiff Koryukin suffered injury and damages, approximately in the amount of $760,166.

334.    As a result of said conspiracy, Plaintiff Yusupov suffered injury and damages, approximately in the amount of $8,108,315.

335.    As a result of said conspiracy, Plaintiff Khomyakov suffered injury and damages, approximately in the amount of $423,796.

336.    As a result of said conspiracy, Plaintiff Shcherbakova suffered injury and damages, approximately in the amount of $502,404.

## THIRD CLAIM FOR RELIEF: CONVERSION
### (against all Defendants)

337.    Plaintiffs re-allege and incorporate herein all the preceding paragraphs.

338.    Each Plaintiff had such Plaintiff's funds collected by Defendants under false pretenses.

339.    Each Plaintiff retrieved the funds from their personal bank account and caused such funds to be transferred to an account controlled by Defendants.

340.    Once Defendants had control of the funds, they diverted the funds for their own personal use and benefit, as described above, and inconsistent with Plaintiff's rights.

341.    Plaintiffs lost their funds as detailed above and as a result of Defendants' use of such funds for Defendants' own benefit.

## FOURTH CLAIM FOR RELIEF: UNJUST ENRICHMENT

342.    Plaintiffs re-allege and incorporate herein all the preceding paragraphs.

343.    Defendants' benefited from collecting and retaining the funds obtained from Plaintiffs.

-56-

344.   Defendants so benefitted at the expense of each of the Plaintiffs.

345.   It would be against equity and good conscience to allow Defendants to retain the funds collected from each Plaintiff.

**PRAYER FOR RELIEF**

346.   Based on the foregoing, Plaintiffs respectfully request that this Court:

    a.   Award a judgment in favor of each Plaintiff in the amount of actual monetary damages proven, including pre- and post-judgment interest;

    b.   Award treble damages under RICO in favor of each Plaintiff;

    c.   Award each Plaintiff nominal damages;

    d.   Award punitive damages against each Defendant and in favor of each Plaintiff, as determined by the trier of fact;

    e.   Award Plaintiffs reasonable attorney fees and costs.

    f.   Grant any and all further relief this Court deems just and proper.

Respectfully submitted,

_____/s/ Gregory Bryl_____
Gregory Bryl, Esq.,
Florida Bar No. 87404
18401 Collins Ave, Suite 1139
Sunny Isles Beach, FL 33160
305-830-9406
703-997-5925 fax
help@bryllaw.com
*Attorney for Plaintiffs*